## JAMES SUMMERS v. THE STATE.

1. EVIDENCE — PRACTICE. — Objections to evidence will not be sustained when no reason was assigned therefor, and the evidence tended to prove any fact in issue.

2. SAME — MEDICAL TESTIMONY. — A surgeon or physician may be compelled to testify as to the result of a *post-mortem* examination made by him. He could not, however, be compelled to make such an examination.

3. SAME — CASE STATED. — In a murder case, the State examined a physician, who declined to state the cause of the death of the deceased because his

knowledge thereof was acquired solely by his uncompensated *post-mortem* examination of the deceased; and thereupon the State proved by an unprofessional witness certain fractures of the skull of the deceased, disclosed by the *post-mortem* examination. The accused did not make the physician his own witness, and the other evidence suffices to show the cause of the death. *Held*, no error to the prejudice of the accused. The unprofessional witness was competent to state what he saw at the *post-mortem* examination; and, if the defence desired the undisclosed knowledge of the physician, they should have made him their own witness, and have asked the court to enforce its disclosure.

4. Express Malice. — This element of murder in the first degree was not correctly expounded by an instruction that "express malice is where one, with a deliberate intent, kills another with an instrument likely to produce death." But, the conviction being only for murder in the second degree, the inadequacy of this definition is not material error; nor was it to the prejudice of the accused when implied malice was properly explained to the jury.

5. Same. — A homicide committed with a deadly weapon is not with express malice unless accompanied with the other ingredients of murder in the first degree, — to wit, a cool and sedate mind, and a formed design to kill, or to inflict serious bodily injury likely to result in death, without lawful authority, justification, mitigation, or excuse.

6. Murder — Intent. — Under the Penal Code of this State, as under the common law, the intent necessary to constitute murder need not be an intent to take the life of the party slain. It may be an intent to do him serious bodily harm.

7. Charge of the Court. — Doubts as to the propriety of giving a requested instruction should be solved in favor of the accused.

8. Verdict — Practice. — The presence of the accused, but not that of his counsel, is necessary when the verdict in a felony case is read.

9. Same — Case Stated. — The jury returned a verdict of conviction for murder in the second degree, and assessing the punishment at the penitentiary for life; whereupon the court referred the jury to their instruction that the legal punishment for that offence is the penitentiary for a term of years. The jury then amended their verdict by erasure and interlineation, so as to assess the penalty at the penitentiary for ninety-nine years. *Held*, correct practice, and not to the prejudice of the accused.

Appeal from the District Court of Nueces. Tried below before the Hon. J. C. Russell.

The indictment charged the appellant with the murder of

a Mexican named Benito Martinez, in the county of Nueces,. on September 2, 1878.

The appellant and the deceased, it appears, were both in the employment of Capt. Kennedy, and the fatal blow was inflicted in his pasture. The facts relative to the questions of practice are disclosed in the opinion of the court, and indicated in the head-notes.

Henry Jones, for the State, testified that, on the morning of the killing, appellant and deceased were talking very hurriedly in the Spanish language, which witness does not speak or understand. This hurried talk continued for some fifteen minutes. Witness then saw appellant coming from one side of the camp with a stick in his hand, but does not know where he got the stick, but knows he didn't. have it when he left camp. Doesn't know how far he went. after it. Deceased was on the other side of camp from appellant. Witness saw appellant strike deceased with the stick while deceased was kneeling, striking matches. There was a butcher-knife lying on the ground, some six feet from the deceased, when he was struck. Witness helped carry the Mexican into the camp, and poured water on his head, but did not bring him back to consciousness. Did not speak to appellant, and did not know of a fight until the blow was struck. Deceased always carried a knife. All of this occurred in Kennedy's pasture, in Nueces County.

The witness Roberts testified that the blow was struck while the deceased was in a stooping posture, striking matches to make a fire.

Dr. Spohn, for the State, testified that he was called in to see the deceased, but refused to state the cause of his death, as what he knows of it he got by means of a *post-mortem* examination and his professional skill and deductions of experience, which witness considers his own prop-

erty, and for which the county of Nueces persistently re-
fuses to pay.

Charles Benson, for the State, testified that he was on
the coroner's jury at the inquest over the body of the de-
ceased. Saw two fractures of the skull, through which the
brain could be seen, when the *post-mortem* examination was
made by Dr. Spohn.

*McCampbell & Givens*, for the appellant. The indict-
ment alleges that the assault was made with a certain large
stick. There is no allegation that the stick was a deadly
weapon, nor was there any proof offered to show that the
means used in the assault would ordinarily have produced
death.

On the part of the appellant, we submit that it was not
established by legal evidence that the death of Martinez
was caused by the blow of the stick.

Dr. Spohn, a witness for the State, in his testimony, says :
" He was a medical practitioner. On the 2d of September,
1878, was called upon to go and see Benito Martinez, then
lying at a camp near Kennedy's pasture; found the de-
ceased breathing, but unconscious; had a contusion on the
left side of the head, but no exterior evidence of fractured
skull; removed the patient to town, and attended him until
the next day, when he died; after death, made a *post-mortem*
examination, but I decline to state the cause of the man's
death, as my knowledge was obtained by professional skill
and from deductions of experience, which is my own prop-
erty, and which the county of Nueces has persistently re-
fused to pay for. I have no knowledge of the actual cause
of the man's death, save through the *post-mortem* examina-
tion alluded to."

The court sustained the objection of the said Dr. Spohn in
refusing to disclose the knowledge acquired in the said ex-

amination, on the ground that he, said Spohn, not being paid therefor, could not be compelled to testify as to the same.

And afterwards the State attempted to prove by Benson, who was not an expert, and knew nothing of the science of surgery or anatomy, that the blow caused the death of the deceased, over the objections of the defendant. The court below, in giving this bill of exceptions, appends the following :

" The above bill of exceptions is allowed and approved, with the following explanation and correction : Said Benson having served on the coroner's inquest, and also being present when the *post-mortem* examination was made by Dr. Spohn on the body of the deceased, he was permitted to testify as to such facts, and as to what he had seen during said *post-mortem*, to wit, that during said *post-mortem*, Dr. Spohn called his attention to a fracture in the skull of deceased, which he saw, and also clots of congealed blood upon the brain of said deceased, where the brain was exposed ; but said Benson did not testify as to his opinion, but only to the above facts."

We respectfully submit that the ruling of the court was erroneous, because the facts disclosed that there was better evidence than Benson as to what was the cause of the death of the deceased. It was a violation of what Prof. Greenleaf calls the fourth rule in the production of evidence, — that which requires *the best evidence of which* the case, in its nature, is susceptible. This author says : " This rule becomes essential to the pure administration of justice." 1 Greenl. on Ev., sec. 82.

Roscoe, in his Criminal Evidence, on the first page, says : " It is the first and most signal rule of evidence, that the best evidence of which the case is capable shall be given ; for, if the best evidence be not produced, it affords a presumption that it would make against the party neglecting to produce it."

The facts of this case show that the testimony of Benson and Spohn disclosed that there was better evidence than that of Benson as to the effect of the blow on the head of Martinez, to wit, the evidence of the *post-mortem* examination.

If the court committed an error in sustaining the objection of Dr. Spohn in refusing to disclose the result of that examination, the conviction is illegal, and should be set aside.

The authority of the court to compel a medical expert to give testimony in matters relating to his profession, we believe, has never been before the Supreme Court or Court of Appeals of this State.

We do not think that a medical expert could be compelled to make a *post-mortem* examination without adequate compensation being tendered; but, the examination having already been made, it was a fact to which the court could compel the witness to testify.

We rely on the ground that Summers did not intend to kill Martinez. As there was no allegation that the stick was a deadly weapon, we are authorized to presume that it was not. As the State did not offer to prove that death would ordinarily have resulted from the means used, the presumption is that the State could not have proved it.

"The intention to commit an offence is presumed whenever the means used are such as would ordinarily have resulted in the commission of the forbidden act." Pasc. Dig., art. 1654.

We think the failure of the prosecution to make this allegation and proof is sufficient to set aside the conviction.

In the statement of facts, the witness Henry Jones says he "saw Summers come from the other side of the camp with a stick." No description of the stick is given.

There is no direct evidence that the accused struck the deceased with the stick. The witness Jones says, "De-

ceased was struck on the head; he fell." He also states that there was a butcher-knife lying five or six feet from the deceased. He also states that the deceased always carried a knife.

We think this evidence is not sufficient to sustain a conviction of murder.

But suppose the accused did strike the deceased with a stick, there is no evidence as to its size, — certainly none as to its being a deadly weapon. Then we may presume, at most, that he intended to commit a misdemeanor. In such case, the following should have been given as the law:

"If one intending to commit a misdemeanor, and in the act of preparing for or executing the same, shall, through mistake or accident, commit an offence which is by law a felony, he shall receive the lowest punishment affixed by law to the felony actually committed." Pasc. Dig., art. 1653. And, under this view of the case, it was the duty of the court to give all the law applicable in a felony case, whether asked for by the defendant or not.

The defendant did ask for instructions on the question of negligent homicide, which, we think, ought to have been given. This instruction was based on article 2248, Paschal's Digest, which is as follows:

"When the unlawful act attempted is one known as a misdemeanor, the punishment of negligent homicide, committed in the execution of such unlawful act, shall be imprisonment in the county jail not exceeding three years, or by fine not exceeding three thousand dollars."

We contend that the court erred in refusing the other instructions asked by the defendant.

We think these instructions were particularly applicable, for the reason that the alleged blow was not given with an instrument which would ordinarily have produced death.

The third instruction asked by the defendant was to the effect that, before the accused could be convicted of any

crime under the indictment, the State must prove that the alleged blow was the cause of the death of the accused.

We contend that Benson was not a competent witness as to the result of the *post-mortem* examination made by Dr. Spohn, as shown by the bill of exceptions. Benson was not an expert, and knew nothing of the science of surgery or anatomy. The qualification given to the bill of exceptions by the learned judge who tried the cause shows that Benson's statement was hearsay. Giving the testimony of a witness before the coroner's jury, the fact that during the *post-mortem* examination Benson saw a fracture in the skull, or "lumps of blood on the brain," does not amount to proof that the death was caused by an injury to the brain. The fracture of the skull may have been made during the examination. The lumps of blood may have fallen on the brain in the same way. There was no other evidence of the cause of the death of the deceased. The evidence of Benson shows that there was better evidence in existence, to wit, that of Dr. Spohn, who made the examination.

In the language used by this court in the case of *Barnell* v. *The State*, decided at Tyler, November 23, 1878 (reported in *Texas Law Journal*, December 4, p. 245), "the evidence adduced indicates that there was better, at least more conclusive, evidence within the reach of the prosecution. * * * When the testimony discloses the existence of better evidence, — *i. e.*, more original sources of information, — the law requires its production." See also *Porter* v. *The State*, 1 Texas Ct. App. 394.

Dr. Spohn says: "From the external examination of the said wound, which did not show any great violence, he could not say that the death resulted from the wound. As shown externally, it was not necessarily mortal."

He also stated that he made a *post-mortem* examination of the body, "and that from that examination he did know what was the cause of the death of the deceased."

We further submit that there was grave error in the seventh paragraph of the charge given by the court to the jury, which is : " If you believe from the evidence that the defendant killed Benito Martinez, in Nueces County, with malice, express or implied, with an instrument likely to produce death, as charged in the indictment, you will find him guilty as charged, and the degree of the offence."

There was no allegation in the indictment that the instrument was deadly, or likely to produce death, nor was there any testimony offered that the instrument was likely to produce death.

" If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appears." Pasc. Dig., art. 2272.

" If the weapon with which a homicide was committed were not of the character called deadly,— that is, likely to produce death, or great bodily injury,— the homicide would not be murder, although committed without legal provocation." *The State* v. *Jarrett*, 1 Ired. 72.

" Where no more is stated than that several blows were struck with a stick of curled hickory, with the larger end thereof, without stating more of the nature of the blows than that one of them was mortal, the facts are not so set forth as to leave the question of cruelty as one for legal inference." *The State* v. *Jarrett*, 1 Ired. 72.

We now come to the consideration of the objection contained in the defendant's second bill of exceptions.

The paper purporting to be the verdict was handed to the clerk, and read. It appeared therefrom that the jury had found the defendant guilty of murder in the second degree, and assessed his punishment at confinement in the penitentiary for " the term of his natural life ;" whereupon the court referred the verdict back to the jury, and referred them to the charge, so as to show that the punishment would

be for a term of years. The same paper was then altered by erasing the words " of his natural life," and interlining the words " ninety-nine years." This change was made during the absence of all of the defendant's counsel, and without the consent of the accused, and without his counsel being called. The jury were, however, polled by the court, on its own motion, and each severally declared that the verdict as amended was his verdict.

We think this action of the court, in permitting the verdict to be amended without the consent of the accused, and in the absence of his counsel, was erroneous, and should not be considered as a mere immaterial irregularity. The verdict as originally handed in by the jury was a nullity, and could not have been the basis of a valid judgment, for the reason that the law does not authorize confinement for life as a punishment for murder in the second degree.

It is admitted that when a verdict is informal, the attention of the jury may be called to it, and with their consent the verdict may be reduced to proper form ; but this was not such a verdict. Any verbal charge, or even explanation or direction, especially in the absence of the counsel of the accused, we submit, is in violation of articles 3079 and 3082, Paschal's Digest.

Believing the accused has not been legally convicted, we ask a reversal of the case.

*W. B. Dunham,* Assistant Attorney-General, for the State.

Ector, P. J.   The defendant was indicted in the District Court of Nueces County, for the murder of Benito Martinez, on September 2, 1878. He was tried at the same term of the court, convicted of murder in the second degree, and his punishment assessed at ninety-nine years' confinement in the State penitentiary. The indictment alleges that the murder

was committed with a certain large stick.    There is no assignment of errors.

It is insisted, on the part of the defendant, that it was not established by legal evidence that the death of Martinez was caused by the blow of the stick.    At the time of the fatal blow, the defendant and the deceased were in the employ of one Kennedy, and were encamped in his pasture. The defendant and the deceased had an altercation early in the morning, and the defendant was seen leaving the tent with an axe in his hand, some half an hour before the fatal blow was stricken, and the axe was taken away from him by the witness Roberts, "because he was afraid of trouble."

The witness Henry Jones testified "that James Summers and deceased, early in the morning, were talking very hurriedly; in not more than fifteen minutes, he saw Summers come from the other side of camp with a stick; don't know where he got the stick; he didn't come to camp with the stick; don't know how far he went after it.    The Mexican was on one side of camp, and Summers on the other. Jim was the man struck deceased Mexican.    Deceased was struck on the head; he fell.    He was kneeling, lighting matches, with a butcher-knife lying five or six feet from his side.    I helped to carry him in camp; poured water on his head.    *   *   *   Deceased always carried a knife.    Didn't know anything about there being a fight until blow was struck."

The testimony further shows that Martinez, shortly after receiving the blow, became unconscious, and Dr. Arthur E. Spohn was sent by Mr. Kennedy to see Martinez.    Dr. Spohn, a witness for the State, in his testimony, says: "He was a medical practitioner.    On the second of September, 1878, was called upon to go and see Benito Martinez, then lying at a camp near Kennedy's pasture; found the deceased breathing, but unconscious; had a contusion upon the left side of the head, but no exterior evidence of fractured

skull; removed the patient to town, and attended him until the next day, when he died; after death, made a *post-mortem* examination, but I decline to state the cause of the man's death, as my knowledge was obtained by professional skill and from the deductions of experience, which I consider my own property, and which the county of Nueces has persistently refused to pay for. I have no knowledge of the actual cause of the man's death save through the *post-mortem examination* alluded to." The court sustained the objection of Dr. Spohn in refusing to disclose the knowledge acquired in said examination, on the ground that he, not being paid, could not be compelled to testify as to the same.

Afterwards the State placed the witness Charles Benson on the stand, who testified " that he was on the coroner's jury that held the inquest upon the body of Benito Martinez; was present when Dr. Spohn made, before the coroner's jury, a *post-mortem* examination; saw two fractures of the skull of the deceased, on the left side of the head; could see them plainly; also saw the brains were in a low condition. They had lumps of blood among them." The testimony of Benson was admitted, over the objections of the defendant, and he took a bill of exceptions, which, after reciting the facts in regard to the refusal of Dr. Spohn to testify, and the rulings of the court thereupon, says: "And afterwards the State attempted to prove by Benson, who was not an expert, and knew nothing of the science of surgery or anatomy, that the blow caused the death of the deceased, over the objections of the defendant; to which ruling of the court the defendant by his counsel excepts, and tenders this his bill of exceptions, that the same may be signed and made a part of the record."

The court, before signing, added the following explanation: " The above bill of exceptions is allowed and approved, with the following explanation and correction: Said Benson having served on the coroner's inquest, and also

being present when the *post-mortem* examination was made by Dr. Spohn on the body of said deceased, he was permitted to testify as to such facts as he had learned, and as to what he had seen during said *post-mortem examination,.* to wit, that during said *post-mortem examination* Dr. Spohn called his attention to a fracture in the skull of deceased, which he saw, and also clots of congealed blood upon the brain of said deceased, where the brain was exposed ; but said Benson did not testify as to his opinion,. but only to the above facts.'' It is submitted on the part of the defendant that the ruling of the court was erroneous,. because the facts disclosed that there was better evidence than Benson's as to what was the cause of the death of the deceased, and that it is essential to the pure administration of justice that the rule should be enforced which requires the best evidence of which the case, in its nature, is susceptible. When the testimony of Benson was offered, there was no objection of this kind made to it. Exceptions to the admission of evidence on the trial, when no reason is assigned for objecting to it, will not be sustained when the evidence is obviously competent as tending to prove any of the facts put in issue by the pleadings.

The court may compel a physician to testify as to the result of a *post-mortem* examination ; and it is to be regretted that a member of a profession so distinguished for liberal culture and high sense of honor and duty should refuse to testify in a cause pending before the courts of his country, involving the life or liberty of a fellow-being and the rightful administration of the laws of a common country. Dr. Spohn has doubtless been misled, in taking the position he did, by the misconceptions of certain writers on medical jurisprudence. The question has been recently before the Supreme Court of Alabama, in the case of *Ex parte Dement*, and, after a thorough examination of the American and English cases bearing on the question, the court held

that the law allows no excuse for withholding evidence which is relevant to the matters in question before its tribunal; that the administration of justice being a source of mutual benefit to all the members of a community, each is under obligation to aid in furthering it, as a matter of public duty; and the same principle which justifies the bringing of the mechanic from the workshop, the merchant from his store-house, the broker from his 'change, or the lawyer from his engagements to testify in regard to some matter which he has learned in the exercise of his art or profession authorizes the summoning of a physician, or surgeon, or skilled apothecary to testify of a like matter, when relevant to a cause pending for determination in a judicial tribunal; and that no court would be excusable in exonerating them from giving such evidence without pay, on the ground that it would be a professional opinion. *Ex parte Dement*, 53 Ala. 389. A medical expert could not be compelled to make a *post-mortem* examination unless paid for it; but, an examination having already been made by him, he could be compelled to disclose the result of that examination.

The appellant in this case, however, cannot be heard to complain of the ruling of this court in sustaining the objections of Dr. Spohn in refusing to disclose the knowledge acquired in said *post-mortem* examination. If the undisclosed facts would have benefited the defendant, his counsel should have made Dr. Spohn their own witness, and have asked the court to enforce the law in their own behalf. This was not done, and no exception was taken by defendant to the action of the court in sustaining said objections of Dr. Spohn. The result of the ruling was not to weaken the defendant's cause.

The evidence of the witness Benson was properly allowed to go to the jury. We can perceive no reason why he should not be permitted to testify to such facts as he had seen during the *post-mortem* examination. And this (as

appears from the statement of facts and bill of exceptions)
is what he did, without expressing any opinion as to the
cause of the death of Martinez.

We believe the evidence shows that the defendant struck
the deceased on the head with a stick, and that the blow
caused his death.    There is no evidence in the statement
of facts to indicate that it could have occurred from any
other cause.

It is contended by the appellant that the court erred in its
charge to the jury, and in refusing to give the special instruc-
tions asked by appellant.    The fourth subdivision of the
charge of the court is as follows :  " Express malice is where
one, with a deliberate intent, kills another with an instru-
ment likely to produce death."    This is not a correct defi-
nition of " express malice."    The fact that the killing is
deliberately done is not sufficient to make it a case of murder
in the first degree.

Express malice is where a man, with a cool and sedate
mind, in pursuance of a formed designed to kill another, or
to inflict upon him some serious bodily injury which would
probably end in depriving him of life, does kill such person.
And the existence of express malice on the part of the slayer
is never presumed from the mere act of killing another with
a deadly weapon, by its intentional and deliberate use against
the person killed.    When one person kills another with an
instrument likely to produce death, it would not be a kill-
ing with express malice unless the act possessed the other
ingredients of murder in the first degree.    The use of a
deadly weapon has been frequently singled out as affording
in itself a presumption in law that the killing was malicious.
Mr. Wharton says :  " It is incorrect to tell a jury that malice,
when the weapon is deadly, is a presumption of law.    But
while telling them that whether there is or is not malice is
a point to be determined by a scrutiny of all the facts in the
case, it is proper to remind them that there are certain rules

of probable reasoning which it is right for them to keep in view.. And one of these rules is, that where a responsible person, without authority, and under such circumstances as indicate deliberation, without apparent provocation or necessity, wounds another in a vital part with a deadly weapon, then malice is to be inferred." Whart. on Hom., 2d ed., sec. 671, and cases cited in note.

The charge of the court correctly defined "implied malice." The jury did not find the defendant guilty of murder in the first degree. The appellant, therefore, cannot be heard to complain of this error in the charge in regard to express malice.

The seventh subdivision of the charge of the court is as follows: "Taking the above definition as your guide, if you believe from the evidence that the defendant killed Benito Martinez, in Nueces County, with malice impress or implied, with an instrument likely to produce death, as charged in the indictment, you will find him guilty as charged in the indictment, and the degree of the offence." It is evident that the word "impress," in this instruction, is a clerical error, and should be "express." But, admit it is correctly copied from the charge of the court; the defendant would not be entitled on this account to a reversal of the judgment, as the jury found the defendant guilty of murder in the second degree. There was no evidence in the case which required a charge upon any lower degree of culpable homicide than murder in the second degree.

The court had already, in effect, submitted to the jury, in his main charge, such of the special instructions asked by appellant as were enunciations of the law and applicable to the case as made by the evidence. The seventh subdivision of the charge of the court obviated the necessity of giving the following instruction asked by appellant, to wit: "If the jury believe from the evidence that the defendant did not intend to kill the deceased, and the State has failed to

prove that death would ordinarily have resulted from the use of the means in the hands of the defendant, then the jury may acquit the defendant of murder, and find the defendant guilty of negligent homicide.'' The appellant also asked the following charge : '' Malice and the intent to kill are material allegations in an indictment for murder, and must be proved affirmatively by the State.'' When a defendant is on trial for murder, the prosecution is not required to prove an intent on the part of the slayer to take life when he committed the offence, before he can be convicted of murder. Both under the common law and our Criminal Code, the intent to do serious bodily harm, without legal provocation, excuse, or justification, followed up by the homicide, constitutes murder. Whart. on Hom., sec. 40 ; *McCoy* v. *The State*, 25 Texas, 33. Before we pass from this question, we will take occasion to repeat what we have heretofore said in other cases, and it is this : when the judge presiding at the trial has doubts as to the propriety of giving any instruction asked by a defendant, he should solve that doubt in defendant's favor.

We now come to the consideration of the question raised in defendant's second bill of exceptions. When the jury first came into court and announced that they had agreed upon their verdict, it was handed to the clerk of the court, and read by him. It appeared therefrom that the jury had found the defendant guilty of murder in the second degree, and assessed his punishment at confinement in the penitentiary for '' the term of his natural life.'' Whereupon the court referred the verdict back to the jury, and also referred them to the charge of the court, so as to show that the punishment should be for a term of years. The same paper was then altered by erasing the words '' of his natural life,'' and the words '' ninety-nine years '' were interlined. This change was made during the absence of all of defendant's counsel, and without their being called, and without the

consent of the accused; to which he excepted, and the question is saved by a bill of exceptions. It is evident from the bill of exceptions that said erasure and interlineation were made by the jury, and that when the verdict was returned and read the defendant was present in court.

The statute requires, in all cases of felony, that the defendant must be present when the verdict is read, but does not require that his counsel shall also be present or be called. It is a common courtesy in cases of this kind to have the defendant's counsel called, but a failure to do this will not vitiate the verdict.

We believe that, under the circumstances disclosed by the record, it was proper for the court to refer the verdict back to the jury and call their attention to the charge of the court, as was done in this case, and that in correcting their verdict the jury simply did their duty. No wrong or injustice was done thereby to the defendant. The objections to the verdict are altogether too technical. The jury, after finding the defendant guilty of murder in the second degree, did not transcend the limit prescribed by the statute in assessing his punishment. Therefore, this court has no authority to reverse the judgment on account of the long duration of the punishment.

Believing that the accused has had a fair trial, and been legally convicted, the judgment of the District Court is affirmed.

*Affirmed.*